Slip Op. 16-52

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| CHEMTALL, INC., | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | Court No. 12-00079 |
| Defendant. | |

**OPINION**

[Summary judgment denied for Plaintiff; summary judgment granted for Defendant.]

Dated: May 25, 2016

Robert L. LaFrankie, Hughes Hubbard & Reed LLP of Washington, DC for Plaintiff Chemtall, Inc.

Eric E. Laufgraben, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. On the brief with him were Joyce R. Branda, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Claudia Burke, Assistant Director. Of counsel on the brief was Paula S. Smith Attorney, Office of Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection of New York, NY.

Gordon, Judge: Before the court are cross-motions for summary judgment. See Pl.'s Mot. for Summ. J. and Pl.'s Statement of Material Facts Not in Dispute, ECF No. 32 ("Pl.'s Br."); Def.'s Mot. for Summ. J., ECF No. 34 ("Def.'s Br."); see also Pl.'s Resp. to Def.'s Mot. for Summ. J., ECF No. 36 ("Pl.'s Resp."); Def.'s Resp. and Objections to Pl.'s Statement of Material Facts, ECF No. 37 ("Def.'s Resp."); Def.'s Reply in Supp. of Mot. for Summ. J., ECF No. 40 (Def.'s Reply). Plaintiff Chemtall, Inc. challenges the decision of Defendant U.S. Customs and Border Protection ("Customs") denying Chemtall's

protests of Customs' classification of the imported "acrylamide tertiary butyl sulfonic acid" ("ATBS") within the Harmonized Tariff Schedule of the United States ("HTSUS"). Customs classified the merchandise as "Carboxyamide-function compounds; amide-function compounds of carbonic acid: Acyclic amides (including acyclic carbamates) and their derivatives; salts thereof: Other: Other" under HTSUS subheading 2924.19.80, which carries a 6.5% duty rate. Plaintiff claims that the merchandise is properly classified as "Carboxyamide-function compounds; amide-function compounds of carbonic acid: Acyclic amides (including acyclic carbamates) and their derivatives; salts thereof: Other: Amides: Acrylamide" under HTSUS subheading 2924.19.11, which carries a 3.7% duty rate. The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2012). For the reasons set forth below, Defendant's motion for summary judgment is granted, and Plaintiff's motion is denied.

## I. Undisputed Facts

The following facts are not in dispute. Plaintiff is the importer of record of the subject merchandise. Compl. ¶ 2; Ans. ¶ 2. The merchandise at issue is acrylamido tertiary butyl sulfonic acid ("ATBS"). Compl. ¶ 4; Ans. ¶ 4; Pl.'s Br. Ex. 3 at 26. The chemical structure for ATBS is as follows:

Pl.'s Br. Ex. 3 at 27.

Plaintiff classified its ATBS entries under HTSUS subheading 2924.19.11, Compl. ¶ 7; Ans. ¶ 7, which covers "Carboxyamide-function compounds; amide-function compounds of carbonic acid: Acyclic amides (including acyclic carbamates) and their derivatives; salts thereof: Other: Amides: Acrylamide." HTSUS subheading 2924.19.11. Customs rejected this classification, opting instead for the "other: other" category for acyclic amides under HTSUS subheading 2924.19.80. Compl. ¶ 8; Ans. ¶ 8.

## II. Standard of Review

The court reviews Customs' protest decisions de novo. 28 U.S.C. § 2640(a)(1). USCIT Rule 56 permits summary judgment when "there is no genuine issue as to any material fact." USCIT R. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In considering whether material facts are in dispute, the evidence must be considered in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Anderson, 477 U.S. at 261 n.2.

A classification decision involves two steps. The first step addresses the proper meaning of the relevant tariff provisions, which is a question of law. See Faus Group, Inc. v. United States, 581 F.3d 1369, 1371-72 (Fed. Cir. 2009) (citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)). The second step involves determining whether the merchandise at issue falls within a particular tariff provision as construed, which, when disputed, is a question of fact. Id.

When there is no factual dispute regarding the merchandise, the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions. See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 (Fed. Cir. 1999); Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365-66 (Fed. Cir. 1998). This is such a case, and summary judgment is appropriate. See Bausch & Lomb, 148 F.3d at 1365-66.

While the court accords deference to Customs classification rulings relative to their "power to persuade," United States v. Mead Corp., 533 U.S. 218, 235 (2001) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)), the court has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

## III. Discussion

Classification disputes under the HTSUS are resolved by reference to the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation. See Carl Zeiss, 195 F.3d at 1379. The GRIs are applied in numerical order. Id. Interpretation of the HTSUS begins with the language of the tariff headings, subheadings, their section and chapter notes, and may also be aided by the Explanatory Notes ("ENs") published by the World Customs Organization. Id. "GRI 1 is paramount. . . . The HTSUS is designed so that most classification questions can be answered by GRI 1 . . . ." Telebrands Corp. v. United States, 36 CIT ___, ___, 865 F. Supp. 2d 1277, 1280 (2012).

Under GRI 1, merchandise that is described "in whole by a single classification heading or subheading" is classifiable under that heading or subheading. CamelBak Prods. LLC v. United States, 649 F.3d 1361, 1364 (Fed. Cir. 2011). If that single classification applies, the succeeding GRIs are inoperative. Mita Copystar Am. v. United States, 160 F.3d 710, 712 (Fed. Cir. 1998). Here, GRI 1 resolves the classification of ATBS.

The court construes tariff terms according to their common and commercial meanings, and may rely on both its own understanding of the term as well as upon lexicographic and scientific authorities. See Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003). The court may also refer to the Explanatory Notes "accompanying a tariff subheading, which—although not controlling—provide interpretive guidance." E.T. Horn Co. v. United States, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing Len-Ron, 334 F.3d at 1309).

The issue in this case is whether ATBS is an "amide" or a "derivative" of an amide. HTSUS subheading 2924.19 provides:

> 2924 Carboxyamide-function compounds; amide-function compounds of carbonic acid:
> Acyclic amides (including acyclic carbamates) and their derivatives; salts thereof:
> Other:
> 2924.19.11        Amides…………………………3.7%
> …
> 2924.19.80        Other……………………………6.5%

HTSUS subheadings 2924.19.11, 2924.19.80. These are eo nomine provisions, or more simply, provisions "that describe[] an article by a specific name, not by use." Aromont

USA, Inc. v. United States, 671 F.3d 1310, 1312 (Fed. Cir. 2012) (citing CamelBak Prods.,

649 F.3d at 1364). Absent limiting language or contrary legislative intent, an eo nomine

provision covers all forms of the named article. Nidec Corp. v. United States, 68 F.3d

1333, 1336 (Fed. Cir. 1995).

By definition, all "Carboxyamide-function compounds" and "amide-function

compounds of carbonic acid" covered under HTSUS heading 2924 contain an "amide

functional group." Def.'s Br. Tab D at A66-67. The amide functional group consists of one

carbon, one oxygen, and one nitrogen atom, with a double bond between the carbon and

oxygen atoms and a single bond between the carbon and nitrogen atoms. Three

additional functional groups attach to the amide functional group to form the specific

compounds under HTSUS heading 2924, represented by the variables "$R_1$," "$R_2$," and

"$R_3$." The generic form, with the amide functional group outlined for emphasis, can be

depicted as follows:

Id. The difference between an "amide" and "other" compounds featuring the amide

functional group under HTSUS subheading 2924.19 is a definitional question that turns

on the exact composition of each R-group. See Pl.'s Br. at 12-14 (citing sources); Def.'s

Br. at 11-14 (citing other sources).

There is no factual dispute as to ATBS's chemical structure. ATBS contains an amide functional group with three R-groups attached. The $R_1$ and $R_2$ groups in ATBS are a hydrocarbon group and a hydrogen atom, respectively. The $R_3$ group consists of a compound dominated by hydrogen and carbon, but also including sulfur and oxygen. ATBS compares to the generic amide as follows:

General Amide                    ATBS

Pl.'s Br. ¶ 21; Def.'s Resp. ¶ 21.

Plaintiff contends that ATBS is an "amide" under HTSUS subheading 2924.19.11. Pl.'s Br. at 10. According to Plaintiff, the only specific limitation for the $R_1$, $R_2$, and $R_3$ groups are that they must be "independently hydrogen, hydrocarbyl, or substituted hydrocarbyl." Pl.'s Br. at 12-13 (quoting Pl.'s Br. Ex. 4 ¶ 11 ("Storey Aff.")). Plaintiff's source for this definition is Dr. Robson F. Storey, the Bennett Distinguished Professor of Polymer Science at the University of Southern Mississippi. See id. (citing Storey Aff. ¶ 11); Pl.'s Resp. at 4-5 (citing Pl.'s Resp. Ex. 1 ¶¶ 10-12 ("Second Storey Aff.")); see also Def.'s Br. Tab O at A169-219 ("Storey Dep."). Plaintiff explains that Dr. Storey's definition is consistent with "textbook examples of universally recognized 'amides.'" Pl.'s Br. at 13-14.

Defendant counters that ATBS is only a "derivative" of an amide, not an "amide." Def.'s Br. at 13-14. Defendant explains that lexicographical sources limit the $R_1$, $R_2$, and $R_3$ groups to hydrogen or hydrocarbons. Id. Defendant challenges Dr. Storey's definition as "inconsistent with the tariff schedule, the Explanatory Notes, dictionary definitions, and organic chemistry textbooks," and insists that Dr. Storey's definition is also internally inconsistent. Def.'s Reply at 2. Specifically, Defendant contends that "substituted hydrocarbon" does not appear in dictionary or textbook definitions of "amide."

In the court's view, ATBS is not classifiable as an "amide" under HTSUS subheading 2924.19.11. The HTSUS does not define "amide." See HTSUS Chapter 29. The EN to heading 2924, however, provides a clear definition. According to the ENs:

Amides are compounds which contain the following characteristic groups:

| (–CONH$_2$) | ((–CO)$_2$NH) | ((–CO)$_3$N) |
|---|---|---|
| Primary amide | Secondary amide | Tertiary amide |

The hydrogen of the (–NH$_2$) or (>NH) groups may be substituted by <u>alkyl or aryl radicals</u>, in which case the products are N– substituted amides.

EN to heading 2924 (emphasis added). According to the ENs, the only compounds that may substitute hydrogen in an "amide" are "alkyl or aryl radicals." Id.

Lexicographic sources submitted by both parties confirm that the term "amides" refers to compounds with an amide functional group and either hydrogen, alkyl radicals, or aryl radicals attached. E.g., Wade, Organic Chemistry 984 (8th ed. 2013) ("An amide of the form R–CO–NH$_2$ is called a primary amide . . . An amide with an alkyl group on nitrogen (R–CO–NHR') is called a secondary amide or an N-substituted amide. Amides with two alkyl groups on the amide nitrogen (R–CO–NR'') are called tertiary amides or

N,N disubstituted amides."); Streitweiser et al., Introduction to Organic Chemistry 511 (4th ed. 1992) ("Amides, $RCONH_2$, are compounds in which the hydroxyl group is replaced by an amino group. The nitrogen of the amino group may bear zero, one, or two alkyl groups."); McGraw-Hill Concise Encyclopedia of Chemistry 29 (2004) (defining "Amide" as having the "general formula $RCONH_2$, where R is hydrogen or an alkyl or aryl radical"); Pl.'s Mot. Ex. 6 at pp. 211-13 (website limiting the permissible compounds in each of an amide's R groups to "hydrogen atoms, alkyl groups, aryl groups, or any combination thereof" and depicting example amides consistent with that limitation).

Alkyl and aryl radicals both consist solely of hydrogen and carbon. See, e.g., Hawley's Condensed Chemical Dictionary (13th ed. 1997) (Alkyl group: "A paraffinic hydrocarbon group which may be derived from an alkane by dropping one hydrogen from the formula. Examples are methyl, $CH_3-$, ethyl, $C_2H_5-$; propyl, $CH_3CH_2CH_2-$, isopropyl $(CH_3)_2CH_3-$. Such groups are often represented in formulas by the letter R . . . ."); id. (Aryl: "A compound whose molecules have the ring structure characteristic of benzene, naphthalene, phenanthrene, anthracene and similar molecules, (i.e., either the 6-carbon ring of benzene or the condensed 6-carbon rings of the other aromatic derivatives). For example, an aryl group may be phenyl $C_6H_5$ or naphthyl $C_{10}H_6$. Such groups are often represented in formulas by 'R.'"); Random House Dictionary of the English Language (2d ed. 1973) (Alkyl Group: "any of a series of univalent groups of the general formula $C_nH_{2n+1}$, derived from aliphatic hydrocarbons, as the methyl group, $CH_3-$, or ethyl group, $C_2H_5-$"). The compound in ATBS's $R_3$ position contains sulfur and oxygen in addition to hydrogen and carbon, meaning it cannot be an "alkyl or aryl radical." Pl.'s Br. ¶ 21; Def.'s Resp.

¶ 21. Because the compound in ATBS is not an "alkyl or aryl radical[]," ATBS does not meet the definition of "amide" set forth in the ENs. EN to heading 2924.

Plaintiff's main argument is that many lexicographic sources do not explicitly limit the definition of "amide" to those compounds with amide functional groups containing only hydrogen and alkyl or aryl radicals in each of its R positions. Pl.'s Br. at 18-21; see, e.g., Wade, supra at 983-85 (listing only hydrocarbons as examples of N– substitutes, but not stating that hydrocarbons are in fact the only acceptable N– substitutes). Plaintiff relies on an interpretation of the HTSUS from Dr. Storey, who proposes that "substituted hydrocarbyls" may appear in the $R_3$ position, and that the compound in ATBS's $R_3$ position is one such "substituted hydrocarbyl." Storey Aff. ¶ 13. Dr. Storey refers to several U.S. Patents to support his interpretation. Id. ¶ 22 (citing U.S. Patent No. 8,383,760; U.S. Patent No. 5,811,580; U.S. Patent No. 6,482,983).

The court is not persuaded. The ENs define "amide" by reference to hydrogen, aryl radicals, and alkyl radicals only. EN to heading 2924. Plaintiff urges the court to read "substituted hydrocarbyls" into this list, a phrase which appears in neither heading 2924 nor the accompanying EN. Pl.'s Br. at 18-21. Although Dr. Storey is a potential "scientific authority" that the court may consider to discern the common and commercial meaning of all tariff terms, see Mead Corp. v. United States, 283 F.3d 1342, 1346 (Fed. Cir. 2002) (citing C.J. Tower & Sons of Buffalo, Inc. v. United States, 673 F.2d 1268, 1271 (Cust. & Pat. App. 1982)), neither Dr. Storey nor Plaintiff has identified one dictionary, treatise, textbook, or other information source stating that "substituted hydrocarbyls" can appear in "amides" in addition to alkyl or aryl radicals. Instead, these lexicographic sources

uniformly define or depict "amides" as consisting of an amide functional group with either hydrogen, aryl radicals, or alkyl radicals attached. Consequently, because the compound in ATBS's $R_3$ position is not hydrogen, an alkyl radical, or aryl radical, the court concludes that ATBS does not meet the definition of "Amide" under HTSUS subheading 2924.19.11. See EN to heading 2924.

This leaves HTSUS subheading 2924.19.80 as the only other viable option. Plaintiff argues that ATBS cannot be classified under HTSUS subheading 2924.19.80 because ATBS is not a "derivative" of an amide. Pl.'s Br. at 22-30 (arguing that "derivative" refers to a compound actually derived from another through a chemical process, and that there is no known process to derive ATBS from an amide). The court does not agree. The ENs define "sulfonated derivative[s]" of compounds covered under HTSUS Chapter 29 as compounds "formed by substitution of one or more hydrogen atoms in the parent compound by one or more . . . sulpho (–$SO_3H$) groups. . . . Any functional group (e.g., aldehyde, carboxylic acid, amine) taken into consideration for classification should remain intact in such derivatives." EN to Chapter 29, Chapter Note 4. With respect to ATBS, one sulpho (–$SO_3H$) group substitutes one hydrogen atom on the parent compound, and the amide functional group remains intact. Plaintiff argues that ATBS has not undergone "sulfonation," Pl.'s Resp. at 13-15, but there is no reference in the EN's definition of "sulfonated derivative" to any chemical process or method of manufacture. See EN to Chapter 29, Chapter Note 4. According to the ENs, therefore, ATBS is in fact a "sulfonated derivative" of an amide. See id.

More generally, for purposes of classifying chemicals under the HTSUS the term "derivative" refers to a compound <u>structurally related</u> to another compound, not solely a compound chemically produced from another compound. <u>E.g.</u>, <u>Horn</u>, 367 F.3d at 1331-33 (explaining that "derivative" refers to chemical structure not method of manufacture, and that when Congress intends to "limit the classification of chemicals by source" it uses "more instructive phrases such as 'derived from,' 'produced from,' or 'manufactured from'"); <u>see also</u> Wesbter's New Int'l Dictionary of the English Language (2d ed. 1941) (Derivative: "2. Chem. A substance so related to another substance by modification or partial substitution as to be regarded as theoretically derived from it, <u>even when not obtainable from it in practice</u>; thus amino compounds are derivatives of ammonia" (emphasis added)). Here, ATBS is a derivative of acrylamide because they share the same chemical structure except for the compounds located in the $R_3$ position.

Finally, Plaintiff contends that even if the court accepts that ATBS is a "derivative" of an "amide," classification under HTSUS subheading 2924.19.80 would still be improper because, in Plaintiff's view, ATBS is simultaneously an "amide" and a "derivative" of an amide, and because the ten-digit statistical suffixes under HTSUS subheading 2924.19.11 are more specific to derivatives of "Acrylamide." Pl.'s Br. at 37-45; <u>see also</u> HTSUS subheading 2924.19.11.10 to .50 (statistical subheadings under "Amides" covering "Acrylamide," "Dimethylformamide," "Methacrylamide," and "other"). The court again does not agree. Both arguments presuppose that ATBS meets the definition of "amide" under HTSUS subheading 2924.19.11. See <u>Pillowtex Corp. v. United States</u>, 171 F.3d 1370, 1374 (Fed. Cir. 1990) ("[C]lassification of merchandise should not

be based upon the wording of statistical suffixes, because statistical annotations, including statistical suffixes, are not part of the legal text of the HTSUS."). As explained above, ATBS does not meet the EN definition of "amide," which means it is not classifiable under HTSUS subheading 2924.19.11 (or any of its statistical suffixes).

The court therefore concludes that ATBS is properly classified under HTSUS subheading 2924.19.80 as a derivative of an amide.

### IV. Conclusion

In accordance with the foregoing, the court concludes that ATBS is properly classified under HTSUS subheading 2924.19.80. The court will therefore enter judgment granting Defendant's cross-motion for summary judgment and denying Plaintiff's motion for summary judgment.

_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated:     May 25, 2016
           New York, New York